Can the clerk call the case? Okay. If counsel who are going to argue can approach. Just tell us your name for the record. Joseph A. Power, Jr. for the plaintiffs. Good morning. Katherine Weiler for AlliedBarton. David Maxke for the NACA defendants. Okay. We've given you a half hour apiece for the first argument, 15 minutes for rebuttal. If we unnecessarily harass you, we may give you some more time. Okay? Your Honor, I gave copies of the full photo from the video. I thought it might be easier to follow the video itself. Okay. We've seen the videos, but, you know, that's fine. Okay. Thank you. Also, the microphones are for recording that amplification, so keep your voices up when you're arguing. Okay? Please, the Court, Justice Levin, Justice Mason, Justice Hyman, I'm here on behalf of the estate of Alan Hoover, the estate of Michael McKenna, as well as Ruth Leib, and the estate of Paul Goodson. Dan Koten has law firm. We're gracious enough to allow me to argue just so we avoid duplication. So I'll be arguing on behalf of all the decedents as well as Ruth Leib. Do us the favor of giving us a factual background before you get into the legal arguments, if you could. Well, the factual background in this particular case, without getting into the contract and everything, is it starts at 1130 a.m. approximately when Mr. Jackson is noticed by the security supervisor, if you will. He's the supervisor of Mr. Brown on the approaching the first floor elevator. And he sees him, and he said he appears lost. So that's his first description. Now, by definition, in their own post orders, when one is lost, that person is deemed to be a suspicious person. By their own. This is not me. This is them. So what does he do? He's supposed to approach the person. He's supposed to make inquiry. Why are you here? What's your purpose? Do you have identification, et cetera, et cetera? Nothing was done. He just observed him for a few minutes and then he left. Chambers leaves. Now, it's not until based on what we understand happened around one thirty, a couple hours later, he said two to three hours later, he sees him again on the first floor. And he noticed him, he says, you know, he particularly paid attention to him because he looked like a puppet he had as a child. And he was wearing a black glove on one hand. So it's a little strange to him. And he didn't make any inquiry and violating all their post orders. But why is there what's his purpose? He's loitering by definition. And by their own post orders, a person loitering is a trespasser. And as a trespasser, he's obligated under their post orders to approach the individual, make inquiry. You know, what's your name? Why are you here? You have identification. What's your purpose in the building? And if there is no purpose identified, he's to see him out the door. And if he's uncooperative, he's to call the police and call for support. He did none of that yet again. Yet again. About 1.30 to 2.30. And then approximately quarter to three or so, we see again, Jackson comes up the escalator. As he's coming up the escalator, you see Mr. Brown is standing there in front of the concierge. And Chambers is approaching. He's the supervisor of Mr. Brown. He's approaching. They watch and it appears that Brown tells Jackson to go to the concierge desk. Now he goes to the concierge desk and what he's supposed to do is produce identification and indicate, like most buildings, comparable buildings in Chicago, Illinois, where are you going? And then if their name is not on a list, they're called upstairs, call up to the woods office on the 38th floor. Are you expecting Mr. Jackson? None of that was done. Did Mr. Jackson indicate to the concierge at that time that he was going to the woods firm? He did indicate. She first, apparently, what she remembered is ask for an indication, which would be the first thing. And then there's no indication that she went any further, because you see in the video, he apparently talks to the side. He goes into the wall and he pulls around this wall and he seems to pull things out and put things back. And then he walks away. He leaves. Now Chambers and Brown are watching him get turned away. He's turned away. He's not allowed to go upstairs. And they talk afterwards about it, you know, seemingly. But you see, Jack, you see Mr. Brown pointing with his finger as if to tell him go down the escalator or point where he has to leave or exit or whatever. So they know by definition he was turned on. They admit he's turned on. Now, if you're accepted, you get an I.D. All right. And the concierge is supposed to say, here's your I.D. Wear it around when you're in the building. And he's turned away. So he goes down the escalator and approximately 15 minutes later, he comes back again. Now, Chambers has left the picture while he's away, while Jackson's away. And then as Jackson is talking to Brown, Chambers shows up. Now, Chambers comes from the left to the right. They're in front of the concierge. And now Brown testifies that he's, as he has, you know, pointed a gun at him. And Chambers comes up. Now, they have a post order, if you're aware, that says if someone has a suspicious package, they're supposed to check the package. I would suggest that this would seemingly be a suspicious package if someone has this up to the back of an individual just like this. Now, Chambers says that's not the case. Chambers says when he shows up, Jackson has his hands in the pockets, which he makes him very suspicious of this individual. Number one, he's been loitering. You've got to pay attention. We have others who will audit and want to hear your remarks. I'm sorry. You're drifting. So what happens is, according to Chambers, he's got his hands in his pockets, which made him very suspicious to Chambers. And in addition, he knew he's been loitering around for hours now in the building. So he looks at, he says, he looks at Jackson and says, is everything OK? And then Brown answers for Jackson, everything's OK. Now, the gun was never shown down in that lab. Up until the elevator at the earliest point. It seems that the elevator in the deposition, there's a little inconsistency, but it seems in the deposition, he says he showed it to him in the elevator. So it's not shown. And as you know, there's a post order that says if the security guard witnesses a felony, which kidnapping him with a gun would be a felony, and someone hasn't shown the arm, and you have your supervisor present, and, you know, you're to handcuff that. That's their handcuff. But why should the security company or the building owner and manager be held to some kind of a duty to deal with the guy who's got a gun, says he's got a gun. Hang on, says he's got a gun, and the security guards are unarmed. Well, first of all, that's their own policy. If he hasn't shown the gun and you haven't seen the gun, and you know he's committed a felony and you observe it, and your supervisor's there, there's two people there, right? Now, the only thing you have to do is you have to call the police. So all they had to do was say, call the police to the concierge who's right there, right? And who's going to do that? The only person who could do that would be Chambers, right? Chambers or, no, Brown could have done it as well, call the police. Before he... Right, no, right there when it's happening, or he could have given a call. If he's, if Jackson's standing right there, how can he... Because they're going to... He thinks he's got a gun on him. Well, he says that, but he doesn't show a gun. So if the gun has not been shown, according to their own policies, according to their, I'm not, these are not my policies, these are their policies. If the gun has not been shown, that you can then go to the handcuff policy. That's their policy. And what did their experts say about what could or should have been done? Well, their experts acknowledged. One of them said that he would have indeed tried to wrestle with the guy. That's their policy. I'm just taking their policy, what they're saying. If he hasn't shown a gun, a lot of people threaten individuals with guns or whatever. It turns out they have a toy gun. You don't know. But they're both there. You have two men. You have an individual on the third floor. Things haven't escalated yet. Frankly, if they had done what they should have done in following their post orders, it would never have come to this. But when it comes to this, you know, they're told, their own policies, the post orders say, do not let this person on the elevator. Call the elevators down. Do whatever, but he should not be allowed on the elevator. Why? Because their own manuals and their own post orders provide that things will escalate. Things will escalate, and they did. You know, when this gentleman, Mr. Jackson, was turned away by the concierge because he didn't have an ID, did things escalate? No, he left. He left. So what they're supposed to do is, in being a deterrent, follow their policies. Right from 1130 on, this guy should be questioned. And, you know, they had the Metro Police on the second floor. On the 36th floor, they had another railroad's police, the Union Pacific, on 36th. And that's another problem. They never coordinated with either Metro, and they never coordinated with the Union Pacific, in disregard with their security consultant report, because they're armed, and they're right on the premises. Right one floor below is Metro Police. We're armed. And they never coordinated. Wait, wait, wait. You just said that they followed their security consultant report. AV never knew about that. That's a problem, too. Yeah, so they couldn't have not followed it because they didn't know about it. Well, no, but that should have been part of coordination by the owner of the building. They should have obviously given them the security consultant reports. They didn't. Maybe not. Why? They don't have to. Well, that's a question that echoes the reasonable care. Did they exercise reasonable care in terms of creating their post orders? Now, we're— But what duty did they have to give that to them? They have a contract. In fact, that report was prepared in 2003, one of the reports. The other one is undated. So that was prior to this contract in 2006. That's correct. But when they have it in their contract that they're supposed to be creating these post orders to consult with the owner's security consultant's reports, and they don't give it to them, and they don't ask about it, I think that's an issue for the jury. It's an issue for the jury. Did they exercise reasonable care as they're required to under the law, under the Pippin case? Why don't you address the issue of the voluntary undertaking of the duty on the part of the building, as you raise in your briefs, and the duty owned by the security company and the case law related to it? Well, I would suggest, and they would like to ignore their own contract, but if you look at their contract, the service contract agreement, in two separate places, they talk about they had a duty to protect people. And that's twice, as we make reference, once under the corporate level expectations. The record site is C15157, where it says, their service provider shall provide security personnel and services to operate, supervise, and assist in the administration of security. Premises security program is determined by the owner for the safety and protection of life, property, and premises environment. So, right there you have the corporate level expectations of the security company. And that is in another place as well, on record site C15143, where they were to maintain a continuing employee training program, so as to ensure maximum efficiency of performance of the contract duties, and to ensure the safety of all persons on the property. So, two separate places, they have an obligation pursuant to the Pippin case to protect people. Well, the second one was an obligation to do training. Are you saying that the training was negligent? Oh, absolutely. I mean, when you look at this case, Brown didn't even know the codes. Sure, absolutely. And Brown didn't even know the codes. There's a code 9 and a code 10 for civil disorders. Code 9 for code 10 is if there's workplace violence. He didn't know either of them. Now, Chambers knew them, so that's part of the issue when they're there with him. When they're with Jackson, if he'd only know the code, say code 9, right? Chambers said he knew the code, he knew code 10, right? All he had to do was give him a code, say call the police, he hadn't shown a weapon. If he had his hands in his pockets, things are going to escalate upstairs. Things are going to escalate upstairs as they did. Let's talk for a moment about the case law, because in the trial court below, and I understand that this is a de novo review and we don't have to give any deference to it, but in the trial court below, the trial court seemed to rely heavily on a case that the defendants cited called AIDROS, A-I-D-R-O-O-S, versus Advanced Protective Services. Why don't you tell us whether or not you think that case is something that we ought to consider here? Well, I would suggest if there's any deference, it should be given to Judge Larson, who appropriately interpreted the AIDROS case, and not Judge Flanagan, who did not. I mean, a clear reading of AIDROS, there was nothing in the contract to protect persons or people or life. It was solely limited to property. And that was the holding of AIDROS. The last time Denver did a police allow, you know, that AIDROS is not this case. This case is more like Pippin or more like Cross, although in Cross you had limited duties because it only went to 1 o'clock. But in Pippin, pursuant to contract, and pursuant to this contract, they had a duty to protect people. And frankly, in the lease agreement that the Woods Law Firm had, in which the decedents here were, you know, by fees, there was a duty to protect people. What about the defendant's argument that the imposition of potential liability here will render landlords guarantors of a tenant's safety against a criminal attack by third parties? Well, there's no case, and we do not suggest that anybody is a guarantor. The cases suggest otherwise. If they were a guarantor, then it would be strict liability. This is exercised reasonable care as the Pippin case calls for, as the Version E case calls for. It's a question of fact for the jury in terms of did they exercise reasonable care in not filing any of their post orders. And frankly, in looking at this case, sad to say that the only deterrent in this case, as the security guards inadvertently used it, was their uniform. Their uniform. They did nothing else except wear a uniform. And that uniform worked to the detriment of the people and the plaintiffs in this case, because it's that uniform that got him buzzed in, if you will, by the receptionist when he showed up there. Now, he's not even really supposed to be guarding the inside, as they point out. He's not a guard of their own quarters. But that uniform got him in, and that was it. That uniform increased their risk of harm. Now, if we were to... Is there something in your... We don't. No, but I was just thinking of that. Well... No, I'm just... You don't have to consider it. Well, you don't have to consider it, but I think it's sad that he did nothing to follow any of the post orders, and then the uniform got him in the office. He did nothing. He did nothing. No, they did nothing. They did nothing from 1130 on. They called none of their post orders. Let's assume that we were to find that there is a duty on the part of both defendants. What about the question of causation? Both defendants here argue that this is unforeseeable as a matter of law, and that the conduct of this armed madman, as they call him, was an intervening cause that breaks any responsibility that they might have, breaks the chain. Well, that probably can be true of any third-party criminal act where someone shoots another person. You can characterize that person as temporarily insane, insane, mad, whatever you want to characterize them. He was a man on a mission. There's no question about it. He was on a mission, but deterrence is their job. Following their post orders is their job. The contract said that was their job. The lease said that was their job, and they woefully failed on that. Now, if you get to, in terms of foreseeability, we have, look at the Lee case. I mean, where you have an individual in that case who was stuporous, and he found his way onto the tracks, and he couldn't read English, so they said it was in part a warnings case that he couldn't read English, but the fact that he was over .3 his alcohol level, they said that he found an ability to relieve himself meant that at least he was cognizant enough to maybe follow the warnings, and that was a material factor in terms of whether or not it's an issue of fact for the jury. So they said, in fact, in Lee, they said, in the issue of foreseeability, it has to be highly extraordinary that their negligence would lead to their result in order to grant summary judgment or NOV. So this result is not highly extraordinary. We all know that if you don't provide building security, that someone could be injured or killed, especially at law firms. You know, you have disgruntled clients, and we all, and their obligation was to provide security as comparable buildings. But they never had any incidents like this in the past. There's nothing of a serious nature that ever occurred, nor did a report from the consultants indicate that that was a possibility. Well, the consultants actually did indicate that. They pointed out that an interloper was a serious issue in this building. In fact, the Baker-Eubanks report, an interloper got into the building, and security didn't prevent it. An interloper is different than a madman. Well, it's the same thing, though. It's foreseeability, and you have an interloper. Whoever it is, you want to prevent that person from getting up into that space. And, frankly, they even had a buzzer on to make sure that an interloper, a madman, whoever, who wasn't invited, didn't get onto the premises. And so I think that's significant. If you look at the Bergen E. case, in terms of foreseeability, you know, they said the fact that the lights flickered on and off momentarily, and the assailant, he hesitated. That was enough to say that it was a question for the jury on proximate cause, because of the hesitation. If they had had lights, maybe he would not have done it in the first place. The evidence in this case is certainly sufficient for foreseeability and proximate cause. When you look at even the but-for standard, which we're not required to show, but if you look at the but-for standard, when this man, if he had a gun in his hand, as suggested by Mr. Brown, well, certainly Chambers should have checked the package if he was afraid. All he had to do on the third floor was call a code and say, shut down the elevators, recall the elevators. That's all he had to do. Recall the elevators, call the police, get the Metro Police. Now, they didn't coordinate with the Metro Police. Hopefully the Metro Police would have shown up, but clearly he had a suspicious package, and Chambers just walked away. Let me ask you on the facts again. On the video, is there a time stamp showing when Chambers approached Brown and Mr. Jackson? You mean? On the video. You mean the last instance we have? Because we have the one before that when he's turned away. You mean the last time? Right. Well, I actually have Chambers. If you look at 150155, that's Chambers to the left that's approaching at that time. Is there a time stamp on that? There is, 150155. Oh, 150155. 150157, he gets closer. Then 150201, he's there, he's engaging with them. 150211, he's still engaging. 150212, he's still engaging. And then they start to walk away, it looks like, at 150213. And he's standing there watching. Now, before you go on, what does the record show about the time of the 911 call? The 911 call is not until, as I understand it, later when the shooting occurs upstairs, fortunately. And Chambers now knows he's been turned away. He's security supervisor, if you will. He's the guy in charge from AB. And he knows he doesn't have an ID. And he knows he's walking away. Now, he's either had his hands in his pocket and he's highly suspicious, or he's got his hand in an envelope like this. And he doesn't have the tag showing he's invited. He sees them walking to the elevator. And you see thereafter, he watches them, unless he had his eyes closed. First, does Chambers watch Brown and Jackson go through the turnstile? Well, he sees them walking to the turnstile, clearly. And then he walks away. There were other people in front of them, so they were waiting there. Now, he sees Brown abandoning his post, walking to the turnstile. He watches. And then he heads down the escalator. You know, I mean, the guy doesn't have an ID on him. He's been turned away. He's been loitering in the building. But he went back to his office and he asked about where Brown was. Well, after five minutes, he was going to know. There's someone saying they can't get hold of Brown. But he asked. He wanted to know where Brown was. Well, yeah. Five minutes or so later. Well, I think someone said to him, we can't find Brown. Now, he knows Brown is a man he should know. Brown has abandoned his post with a person who doesn't have an ID tag, who's been in the building since 1130, who has never really asked any questions but one, in which he didn't get an answer. And he doesn't have an ID, and he's watching as Brown is abandoning his post contrary to their own rules. Let's go back to foreseeability in the Samir case, so that anyone can foresee the commission of a crime virtually anywhere and at any time. Are you saying that we should just ignore that, that it's a situation here? Yes. That anyone can foresee the commission of a crime virtually anywhere at any time, so that knowing that a violent act would occur does not make that violent act reasonably foreseeable. Well, I would think if you look to their own Preventing Workplace Violence, which was published in June of 2005 by L.I. Bartlett's 17302, when they talk about Pamela Jones being gunned down and there was a vehicle in their parking lot for a couple days, no one made any inquiry, no one reported it, and it was the husband, if you will, of the lady who was killed. And they call that, that's an example of suspicious activity that could have prevented the occurrence. And that's in 17315 in the record. They themselves hold this out as an example more than a year before the occurrence, of a foreseeable occurrence, that someone should have made inquiry and reported it. Someone should have gone up to this individual sitting around in the car and said something. And then this could have been prevented. That's what they say themselves. This is suspicious act. Now, clearly we have Mr. Chambers saying that this guy was highly suspicious, that he was loitering, he was lost, right? By definition, if he's loitering, he's a trespasser, and there's certain obligations that they have in their post orders, what they're supposed to do in respect to people who are lost, people who are loitering, and none of that was clear. The question is whether it was foreseeable that a crime would occur. Well, they talk about... But that doesn't support the duty. Well, the duty is in the contract. And then they have to fulfill their duty, and part of the contract includes the post orders, and that's the duty. There's no question they had a duty under the Pittman case. I don't think any case, there's no case they will cite where they have a contract that says they're to protect people that they said there's no duty. There's no case that says that. So they agree there was a duty. I think, well, that's what the law says. They may not agree to it. They don't agree to anything. They said Judge Larson didn't even offer an opinion, right? Judge Larson didn't give an opinion. Judge Larson, she gave an opinion in the record, and she pointed specifically to page 15 where their duty was. Right? I mean, that's clear. But they claim that she didn't do that. Well, I would suggest Judge Larson was right in this case, that you should give deference to anyone and Judge Larson, not Judge Flanagan. Judge Flanagan was clearly wrong. Judge Flanagan went to the but-for test, and I'll tell you the but-for test, that if only Chambers had just... I don't know what was to happen to Chambers that day, but if he had just used his common sense and called security, the guy that's right, you know, within 100 feet of him, in that little room, and said, call the escalator, call the elevators down. Recall the elevators. That was his job as well as the director of security, to call the, to recall the elevators. So it wasn't NACA defendant's fault? It was just the fault of... No, no. It was NACA. There was responsibility here. They had under the contract. They had concurrent duties. If you look at the post orders, NACA themselves, they had more people involved in security than they did A.B. Barton. In terms of responsibilities, the director... Yes, but they didn't... On the scene was Brown and Chambers, and apparently Chambers looked at those posts and everything else. Those people are the ones that were involved in allowing a suspicious individual not to be inquired. Well, they have, they employed the director of security, Mr. Jennings in this case. Mr. Jennings didn't even make sure that these guards knew the codes, the emergency codes. You know, sad to say, Brown had been working there for a few years, and he didn't know the emergency codes. Chambers had only worked for a month, and he knew, yeah, if he called code 10, I would know that that meant there was a problem. That's what Chambers... Was it NACA's fault because they didn't have a code? They had no training. There were codes. No, that's it. The contract provided for training. You already said that the training was negligent. I know, they were negligent. They were negligent in making sure that these guards, in particular in this case, Mr. Brown, that he knew the codes. Who was, when you say they? No, director of security. They had to... That wasn't under the contractor's responsibility. I thought it was on AV to provide for the training. No, but they were supposed to work actually with the owner in respect to the security consultants. The owner retained some control here. Absolutely, yes. It's more like the cross case, but in this case, we have concurrent liability because we have failures on both. You know, this, if they had made sure he was... I mean, how does he not know an emergency code? In fact, Jennings told... Let me strike that. Mr. Chambers said two weeks before this occurrence, he told Jennings you should get a distress code, which they did, and that was recommended actually in the security consultant's report to get a distress code on their radio, and they did three weeks after the occurrence. So all they needed to have was a little button. It cost $4,579, right? So we have three people dead, one person injured because of that, right? That was a recommendation. That's a question of fact for the jury. Did they exercise reasonable care in not knowing emergency codes and not following their security consultant's recommendations? And then in particular, Chambers tells Jennings, the director of security, you guys should get a distress code. I worked at Fox, over at the Fox station. He worked at Boeing. He said there were a lot of failures on the part of the owner of the building. They didn't follow a lot of my advice, but in particular, one of them was the distress code. I'll ask you to wrap up if you could. Okay. Well, I think in respect to the post orders, they're complete in terms of what they violated. I can deal with that if we're out on rebuttal, but clearly, most importantly, the contract duties were not fulfilled. The only thing that was done in this case was they put a uniform on. They're supposed to be here deterring conduct like this, and they put a uniform on. You can imagine, just in any building, if this was allowed to occur and no one at any time followed any of their post orders, any of their manuals, they allowed this man to loiter in Rome, lost, suspicious, and no, absolutely no inquiry in terms of why he's there. He's allowed to go up into the elevators. Their post orders say he's not to be allowed in the elevator. Recall the elevators. They disregarded everything, and that's why we're here. I don't think there's even, it's close in terms of causation. The Lee case, the version eight case, clearly not anything like this. If he had only had, I don't know what was going on with Chambers, but if he had only recalled the elevators and notified the police, notified Metro Union Pacific, this clearly would have been averted. And for that, I ask that you reverse the court below and decide that this is a question for the jury and not summary judgment, which should be a rare and not common occurrence. Thank you very much. Thank you. Good morning, Your Honors. Good morning. May it please the court, Catherine Weiler on behalf of Allied Barton and Robert Brown. I'll be dividing my time with my co-counsel. Obviously, I will do my best to answer the court's questions, but just to make that clear, we've divided our time. Are you dividing up issues or just... We're dividing as to the liability of our individual clients. So it's not separated as in I'm addressing duty and he's addressing private costs. And you'll both deal with causation? That's correct. We'll both deal with whatever questions the panel has. We have a couple. I suspect it is. Your Honors, there are two things that I want to particularly address. The first is the scope of duty in this case. It's a legal issue. I realize that we've spent the last half hour discussing the facts of this case. I want to get to duty, but before I do, I want to specifically discuss some of the facts that were raised by counsel, particularly as are related to the post orders, because this needs to be very clear. It also goes to this court's analysis of exactly what the scope of Allied Barton's voluntary undertaking was in this case. That voluntary undertaking did not include the use of every possible effort to protect individuals in that building from third-party criminal attacks. And because of that, Judge Flanagan's ruling should be affirmed. The post orders specifically discuss issues such as the challenging of waiters, the searching of bags and packages, and the use of emergency and direct code. What about workplace violence? Did they discuss that? They do discuss workplace violence. What about the possibility that the workplace violence might involve people who are armed? The guards at this facility are not armed and are trained. No, I'm asking you whether or not the documents, the post orders, whatever you want to call them, the rules and regulations here, whether they address the possibility that an intruder, an interloper, could be armed. They do, and the guards are specifically instructed in the post orders not to try to disarm someone. If they see a weapon, right? That's correct. That's correct. You don't get that situation at the earliest until he's on the elevator. That's assuming. So is your unarmed guard's job to escort him to the elevator to take him upstairs with his gun? No, the unarmed guard is not expected to risk his own life to protect or, excuse me, to disarm a gunman who is telling him, I have a gun in this envelope against your side. I have a gun. That guard is not trained to try to disarm that individual. What's he guarding? He is there as a deterrent, and at that point deterrence is not the issue. What did he deter between 1130 and 3 o'clock? That's a different guard for starters, and I don't mean to avoid the question just so that we're clear on the facts. Mr. Brown is not the guard who allegedly saw Mr. Jackson wandering around the building. Mr. Chambers is. I mean, they're working for the Allied Forces. That's correct. That's correct. But I only point that out to suggest this is not a situation where Mr. Brown encountered Mr. Jackson repeatedly during the day and then Mr. Jackson appeared at his side with a gun. No, we understand that. That said, Mr. Chambers in his testimony repeatedly said if, in fact, he is correct and he saw Mr. Jackson wandering the building during the day, and that's not entirely clear, but assuming for the sake of this discussion that that's accurate, Mr. Chambers testified Mr. Jackson wasn't doing anything suspicious. This is on the first floor of a major transportation center in this city. There are 100,000 people who walk through that building every single day. Mr. Chambers testified he saw Mr. Jackson. Mr. Jackson looked lost. He watched him for a couple of minutes. He didn't see anything suspicious, and they moved on. It's a train station. That's probably not an unlikely scenario for a security guard to witness an individual looking confused in a train station. What about when he's shown the way to the escalator instead of being taken out of the building? Isn't that a violation of post orders? No, it is not because, once again, Mr. Chambers testified he did not think there was anything suspicious about what Mr. Jackson was doing. He testified that he observed him, that there was nothing suspicious. This is in the record at C-15712 and C-15713. It's in Mr. Chambers' deposition. Okay, and do you think this is the third time when Mr. Chambers sees him at the concierge desk? Did you think there was anything unusual? No, he didn't think there was anything unusual. So by 3-02, when he encounters Mr. Jackson and Mr. Brown together, he does believe there's something, and what does he do? He approaches. He approaches Mr. Brown. Mr. Brown said, no problem. He walks away. That's correct, and that's exactly what the post orders expect. That's what they are required to do. But shouldn't they have had a code? I mean, if they had had the code and Mr. Chambers had requested some codes a couple weeks before, it's a very simple thing. It's part of normal security. This whole thing would have been different. It's a multi-part answer. The no is the straightforward answer, but to qualify that, it needs to be clear. There were no duress codes, and there were no duress codes in the post orders. There's been a lot of discussion about codes. But when you say there's no duress codes, was there a call for duress codes, or you're saying there was not a reference to duress codes? I want to answer the question. So in the code, the post orders discuss an emergency code, not a duress code. Wait, wait, wait. What's the difference? And there is a difference. The emergency code is intended to be used by radio to personnel to not give the nature of a disturbance in the event of some sort of a workplace disturbance there, so there isn't a discussion going on over the radio about where a workplace issue or an incident is occurring. That's why the guards are advised in their post orders to use the emergency code 10. That is not to be used as a duress code. There's nothing in the post orders that says when Chambers approaches Brown, Brown should say code 10, and that will somehow alert Chambers to the potential problem. So you're saying there's no mention in the contract or the post orders of the duress code? That's correct. Nothing about the duress code, but the only difference would have been that Chambers had said something a couple weeks earlier? Well, Chambers testified he thought maybe they should have some sort of a duress code in place. He suggested that he discuss that with a supervisor. He didn't recall who. He couldn't recall when. He couldn't recall much information about that. But what is important about Chambers' testimony is that he was specifically asked in his deposition if he would have recognized a problem if Brown had said to him emergency code 10. And Chambers said he wouldn't have. He wouldn't have known what it meant. If that had somehow come up, Chambers would have wandered back to the security room on the same floor and been trying to figure out who's calling on the radio to announce that there's some sort of a code. I appreciate that we pushed you down this spur ramp, but what we need to hear from you is why the security company that you represent, that signs a contract to protect life, did not voluntarily undertake to protect the possibility of workplace violence. Because the scope of their voluntary undertaking is specifically defined by the terms of the contract. And the terms of the contract are not simply that Allied Barton undertook to protect the safety of all individuals and used every effort to protect the safety of all individuals in that building. Who are they supposed to protect? They are to use reasonable efforts to protect unauthorized access to the building. What happened here? And here, they used reasonable efforts to protect against unauthorized access to the building. But here, there was a direct threat with a weapon against an unarmed security officer, and that unarmed security officer had been specifically instructed in the post orders and specifically trained to use reasonable efforts in conformance with common sense and good judgment, but do not use force to restrain people or jeopardize yourself to do so. There is training, and I know the court has seen the training manuals. It is exactly what happened in this case. It's at C-11-514-15. Don't be a hero. Physically confronting an attacker or trying to grab their weapon will only risk harm to yourself and others. They were trained what to do in this situation, and they followed that training. That is not a deviation from anything. All right. You have a contract where you are to protect life, and the law would suggest that that may be a voluntary undertaking. I'm going to ask you a question and ask you if you agree with this statement of law, that if a defendant is deemed to have voluntarily undertaken a duty to protect people like tenants, the related question of foreseeability is subsumed within that undertaking. In other words, if we find that there's a duty to protect the tenants in this situation by your client under the contract, foreseeability is taken care of once we've reached that decision. No, Your Honor. So you can foresee workplace violence, but we're supposed to say that it's unforeseeable that it might occur. I think Justice Hyman already answered that question. You can foresee any act of any violence anywhere. But Berg, even though Berg found what I believe Your Honor is suggesting, Berg said specifically as well, Justice Gallagher said, there is not an automatic obligation. There is not automatic liability. You know, you went into court with a motion for summary judgment that's about as high as this bench and said that there was not a single question of material fact after another judge said that there were plenty. Allie Barton went into court and said we did not voluntarily undertake to provide a duty in this case. But there's evidence of it in the form of Patrick. You say it says one thing. The plaintiff says it says another. You could try this case and win. You could try this case and lose. That's why there are questions of material fact on this issue. Not about what the contract says. That's for this court to decide. That was for Judge Flanagan to decide, and she decided it. It's for us to decide whether or not there is a duty that was voluntarily undertaken in this case. That's correct. And in order to evaluate the scope of that duty, this court needs to look at the facts of the case, including the language of the contract. And if we find that there is such a duty, the question of foreseeability as a matter of law is subsumed within that. No, I disagree. And, in fact, Berg pointed to case law that suggested that this court was divided on that issue, that foreseeability was not necessarily subsumed into that analysis. And it shouldn't be. One thing just to clarify, Judge, because it is a very important point. You were discussing, Justice Lavin, the scope of duty as to tenants in the building. And, actually, the post order specifically addressed that as well. Allie Barton's guards were not there to provide security to building tenants in their space, which is where this incident happened. How did he get there? He was escorted there. He took a guard hostage and forced the guard to take him to that space. With an envelope. With a gun. There was a gun in the envelope. There's not a question about that. It was there. There was a gun in the envelope? There was a gun in the envelope. I thought the gun was in the bag. His hands were in his pockets. There are questions that have to be resolved. Just on this little point here, where was the gun? Did he have the gun there? Was it in the bag inside his coat? That does not go to his duty. His duty is defined by the post orders. And the post orders do not say that he should risk his life to disarm a man who's trying to take him hostage with a gun. All someone in the building has to do is tell a guard, I'm armed. And the guard says, the guard is helpless. The guard has to use a reasonable effort. He doesn't see a weapon. He doesn't display a weapon. Where's that in the contract? No, what the guard has to do is use reasonable efforts in that situation. What reasonable efforts did he use? He had a gunman standing next to him with an envelope that had a gun in it. When Chambers comes up to him, this is a key point, right? Because that could have stopped him from going in the elevator. Potentially. What happens? What does Brown do? When Jackson walks up to him around Chambers. When Chambers walks up to the two of them, you said he has a gun under his back. And he says everything's fine, right? Correct. Is that reasonable effort? Yes, it is. Why is that reasonable effort? Because Brown. Why should we decide it for you? Should the jury decide it? No, because the contract and the post orders address what Brown was supposed to do in that situation. He was supposed to do nothing? You're saying he's supposed to do nothing? No, he's supposed to use reasonable efforts. He's supposed to decide what's reasonable. A judge on summary judgment or a jury? This court makes that decision when it is evaluating the scope of a duty. You're asking for too much. That is what this court has already said. This court has already said this is a matter of law. To determine exactly what the scope of the voluntary undertaking is, this court needs to evaluate the facts of the case. Absolutely. And as I pointed out before, one of the things that has to be looked at when you're looking at duty is foreseeability. And if criminal actions is something that's specifically mentioned in the contract, you're telling us that there's no voluntary undertaking of the duty and you can foresee something that could happen but it's unforeseeable as a matter of law. How does that make sense? I agree with the way that question is phrased, Judge, that that does not make sense and that is not Allie Barton's position. What the post orders require is, for example, the challenging of waiters. Well, there was no loitering here. No one has identified. Chambers did not testify that Mr. Jackson was loitering. Chambers has testified that he saw him. Those are two different things. So there's no issue related to the challenging of loiters. Next, there's the searching of bags and packages. Isn't that loitering when somebody's around for three hours? Not if that person, no one was seeing that person for three hours. And when he steps away and then he comes back? That's not loitering? What is it? It's kind of strange, isn't it? It might be strange. It might not be strange. It's his duty. That's the duty to protect the security. That's why they're there. And that's when Chambers approached Brown to ask him that question. He did exactly that. When he noticed what was happening and realized he had seen this individual, according to his testimony that he had given, if that's accurate, he claims he saw the individual in the building. He approached him once when he was talking to Brown, and Chambers thought it was strange the way he was standing. And so he then, now having formed the opinion that this individual is strange and behaving in a strange way, then turns around and walks away. Because he was told by his colleague that everything was fine. That is a reasonable conclusion. And not only that, but he was... That's reasonable. It is reasonable. Isn't that something that somebody should decide to call a fact finder? No. Do you think that's reasonable? No, because, again, the scope of the duty is determined by this court, and the contract specifically requires, the voluntary undertaking, is for Allie Barton to use reasonable efforts. But that's the question. I mean, it's kind of rhetorical. You're saying the same thing. What's reasonable to one party may be unreasonable to another, and that's why you have juries. But that is not the jury's job, is not to determine the scope of the duty. And the scope of the duty can only be determined by an evaluation of that. No, but the scope of the duty is to take reasonable means. And the jury can determine whether, in this situation, under these facts, what Chambers did was reasonable. The scope of the duty is that Allie Barton was required to use reasonable efforts to, without exposing themselves or others to threat of harm. And that is what they did here. They used reasonable efforts without exposing themselves or others to threat of harm. That brings us to a good point to ask you how the ADRU's case is something that the trial court should have relied upon and that we should rely upon. Because the security guard in ADRU's did exactly what Mr. Brown did. What did the contract call for the security service to do in that case? The contract in ADRU's is different. The contract in ADRU's called for the provision of protection services for property. It did not discuss provision of guaranteeing the safety of the individuals on the premises. Apples, oranges. You have one case where they're out there to protect for property and vandalism, and another where the contract says that they're there to protect life. And we're supposed to rely on that case? This court also discussed exactly this issue in Blankenship. And Blankenship is analogous to this case. In Blankenship, there was a provision in the contract that it was in the mission statement, Sintegra's mission statement, that suggested that the security services were to protect the employees. Provide for the protection of Sintegra's employees. And in Blankenship, this court agreed that a horrific and unforeseeable attack, as is what happened in Blankenship, does not expand the scope of a duty despite the existence of a provision like that. Even if it's part of the post orders. And in Blankenship, it's not part of the post orders. It's part of the general mission statement. That's what we have here when you're discussing the existence of provisions that suggest that Allied Garden is responsible for providing for the safety and protection of life. That is in a corporate expectation statement, and it does not undo everything else in the contract, which makes clear that the duties of these individuals, the security guards, are to maintain social and business order at the property without exposing yourselves and others to threat of harm. No other duties are to be assumed or implied by a security officer. This is at C-11575. It's in their post orders. That is the extent of their duty. All right, I would ask you, given time, to address causation, and we'll give you time to do that. I was just going to turn to causation. All right, we're on the same page. Hopefully we are on the same page. We'll see about that. Causation cannot be based on mere speculation, just surmise, or conjecture. Everything that has been discussed about what could have happened, maybe would have been different, perhaps would have changed in this situation, is entirely based on surmise and conjecture. Even the plaintiff's expert has said it may not have changed anything. If Brown had tried to disarm Jackson, it may not have changed anything. If Chambers had done something differently, it may not have changed anything. I believe he pegged the odds at 50-50. What could have happened in this case, easily, according to plaintiff's experts, is there is an attempt at disarming Jackson, an individual who, as Justice Hyman has noted, was absolutely intent on doing what he came to that building to do, and there's an attempt to disarm him which potentially, God forbid, leads to everybody on the third floor ending up dead. There is no way to know. It is conjecture, and because it is conjecture... Does the plaintiff have to prove under causation in Illinois, whether it's cause and effect or legal causes, does the plaintiff have to prove every little thing that this man did, that they had to foresee that he would do this, that he'd get past the guard, that he'd get on the elevator, that he'd get upstairs, that he'd call for the lawyer, that the secretary would come out, he'd put a gun to everybody's head, and start shooting. Does the plaintiff have to foresee that? The plaintiff needs to prove that our actions, that Alec Barton's actions, were a material and substantial factor in bringing about the injury. Why is that not a question of fact? There are hundreds of cases that say that proximate cause is almost always a question for the jury. That's absolutely true, but not in cases involving speculation, guess, surmise, or conjecture, and that's what we have here. What if Mr. Brown had somehow fluttered his eyelids and given Mr. Chambers a sense that something else should have changed? What if the gun were visible? What if Mr. Chambers had seen the gun? All of that is absolutely conjecture, and that is why Judge Flanagan correctly stated there needs to be a causal nexus between Alec Barton's actions and the injury. There needs to be some sort of causal nexus between Alec Barton's failure to stop a man who had taken a guard hostage for Alec Barton's... But you keep focusing on that moment and the threat of physical harm to Mr. Brown. Mr. Chambers didn't know anything about that. But there's a whole period before this where we can ask ourselves whether if one of these uniformed guards had gone up to Mr. Jackson and said, I noticed you've been around the building now for several hours. Could I see your ID? He had been asked for his ID at the reception desk and had been turned away, and that, they thought, was the end of it. To the extent that anyone was even noticing that this was happening because there was nothing out of the ordinary at that point. This individual was in the building along with 100,000 other people. This individual had been noticed by Mr. Chambers, but Mr. Chambers, a trained security guard, didn't think he was doing anything suspicious. He didn't think there was cause for concern about this individual. That might be a good argument to make to a jury. But there needs to be a causal nexus between what Mr. Chambers did or did not do, allegedly, and what ended up happening with Mr. Jackson, and there isn't one. Mr. Jackson decided to walk into a building with a gun, intent on doing what he did, and he did it. The instruction that the jury has given says that it doesn't have to be the last or nearest cause. It's sufficient if it's something that, in natural or probable sequence, produced the injury complaint. And what my colleague is suggesting to you is that earlier interdiction with this suspicious, loitering man who, at a certain point in time, had been told he didn't have the right to be there, if something had been done in a material way, in a substantial way, to get him out of there, that maybe, in natural or probable sequence, this never would have happened. A man that no one thought was loitering or suspicious until the moment he was interacting with Brown. I just have a hard time with the concept that someone who is in a building like this, for hours on end, going to different places, just wandering, different places, is not loitering. Assuming that's accurate, assuming that's where he was, there's no testimony that he was still in the building. There is nothing about that. You have the testimony from Chambers saying he believes he saw him a few times in the building. That doesn't establish that Mr. Jackson was wandering the halls of the building for hours on end during that day. There's nothing in the record about it. Let's put that to the side and say, okay, we agree with counsel on that one. What about when he goes up and wants to go to the 38th floor and is rebuffed by the concierge personnel? Then they have noticed, specifically, that the man doesn't belong in the building. And what do they do? They point him to the escalator. That's reasonable? Yes, because the man stands at the security desk, doesn't offer ID, so isn't allowed to go upstairs, and leaves. Where else would he be instructed to go? The security guards have no reason to escort him out arm in arm. He hasn't done anything at the desk that would suggest that he required that. Let him hang around. Why not? Why not? They have a man who went to the concierge desk, evidently has no ID, certainly has no appointment. Chambers has seen him several times during the past few hours. Why not say, sir, I think you need to leave the building? Because he did leave the building. He walked to the escalator and he left the building until he came back upstairs. But that, Judge, that again requires speculation. He went to the second floor. You don't know where he went. He went to the escalator. He was turned away. What they understood was their obligation was to make sure he didn't enter the building. Let the people on the second floor deal with him. No, their obligation was if he was going to be allowed to go upstairs to the 38th floor, he would be allowed to do so by the concierge desk. He wasn't allowed to go up to the 38th floor, and he left. There was nothing that was happening with that particular individual that would have suggested that he required their escort out of the building. I'll tell you what, if people don't think that he's acting suspiciously, I guess I can understand why this would happen. Your Honor... Trained security professionals. Trained security professionals who are expected to deal with situations that were not presented here, to deal with individuals who were making a scene, who were being loud, who were causing problems. This individual walked up to the concierge desk, was turned away, and he left. It sounds like if somebody was being loud and creating a problem, Mr. Brown and Mr. Chambers would have backed off. Not at all. Not at all. And that's why they are expected to use reasonable efforts under their contract. That's what their... All of their obligations are to be reasonable, to perform their duties, to respond to different situations. This is not one of them. The whole question boils down to who's making that decision, whether it's reasonable or not. You say that we should make that decision. Judge Flanagan made a decision to follow her reasoning. The opposite view is that that's something for the jury. That, to me, is right there. That's where this case turns. So, with regard to your position, other than what Judge Flanagan said, you're relying on... What is your major case? Blankenship and age risk. Blankenship and age risk do exactly what Judge Flanagan did in this case. They look at the contract, they look at the scope of the voluntary undertaking as defined by the contract, and they make a determination based on the fact of the case of what is the extent of the duty. If you're relying on age risk, you're leaning on a rather slender read here. And blankenship, Your Honor. Yeah, either one. Your Honor, I realize that my court counsel has issues to address with the court as well. If there are further questions, we ask that the court affirm Judge Flanagan's ruling. Thank you. Thank you. Thank you. State Police Court. Mr. Maxey. Mr. Maxey on behalf of the NACA defendants. I've got a highlight of some of the issues that you had raised. I'm not going to retread the ground because... Hold that mic up. I won't retread that ground. To start out, under Illinois law, the NACA defendants had no duty. We did voluntarily undertake one duty, and that was to hire Allied Barton as a security agency. But what about this Jenkins guy? What's his job? I thought that they were working in concert and they had a report to him, and they went over the systems and came to some decisions together. It seems like they remained on board. They didn't just delegate it. No, they... Jenkins' job, he's the director of security for the building. Right. But in that role, 90% of his time is devoted to working with different law enforcement agencies, the FBI, flood control, earthquakes, FEMA. He's in charge of basically the infrastructure of the building, keeping it safe. They retained Allied Barton to man that infrastructure itself. So there's a security infrastructure in place, and they retained Allied Barton to man that security infrastructure. But Mr. Jenkins is there breaking down the door with Mr. Chambers to the law firm. Well, when this incident occurred, they did contact him because he was in the building, and he did go up there and assist. He did go up there and assist. But his role was not to man the different elements of the security infrastructure. No, understood. But what did the contract envision his continuing interaction and involvement with the security contractor was going to be? The contract involved that he was only going to be dealing with the Allied Barton officers, meaning that the home office, not the direct officers there in the building. Yes, if he saw something, if he saw somebody maybe that wasn't at their post, he would contact the supervisor, off-site supervisor, and let them know. But didn't he have some involvement in the formulation of these post orders and the protocols that the Allied Barton officers were supposed to follow? According to his testimony, and my understanding of the testimony in the record, is that he did not. The contract didn't envision that either? The contract, there was a provision in there regarding working with the director of security. Whether that was done, it's not clear. But the fact is, under a voluntary undertaking duty, a voluntary undertaking analysis, it's what you did or what you didn't do. So if it was in the contract and they didn't do it, they never voluntarily undertook that duty. But one thing they did do is they had a couple of consultants, and the information that they knew there were certain things that should have been done that weren't. They never passed that on to AV. So isn't that something that they should have been doing? That's what Mr. Powers is saying. Well, that contract provision does not mention the coal or the bakery. It doesn't have to. I mean, the question is, it's your responsibility. I mean, here you hire consultants. They tell you what to do because there's just been a disaster in the United States. You want to protect. You have a building on top of a railroad. There's a lot of things that have to be done. And they make recommendations, and they're not passed on, not even mentioned, to the people who are providing the security. You just hold your hands and say, oh, well, we had no responsibility. Those recommendations, you're correct, were made right after the September 11th incident in 2001. At some point shortly thereafter, within the next couple of years, there was a capital improvement program at the building where a lot of those recommendations were incorporated into the new infrastructure. So, for example, the turnstile system was incorporated. I understand there was some somewhere. Yes. You had a responsibility. That's why you hired these consultants, and that you should have followed all of the recommendations or some other recommendations that weren't followed that might have provided exactly what should have been occurring here. There's no duty under the law that says that a recommendation from a security consultant or anybody is that you're required to follow it. No, but you have a duty to inform A and B to make sure they're applying the best practices. Especially if you're a director of security still involved. The point here is that you had a reporter, I think it was Baker Eubanks, that talked about the very real possibility that an armed interloper could gain access to the elevator lobby and go up to the private offices. And it's the position of your co-defendant that they were never informed about that finding, and isn't that something then that would create a question of fact as to whether or not proper security was ever established here? Well, first of all, the contract, again, the specific terms do not mention the Baker Eubanks or the Kroll report. There are other consultants that they had utilized over these years. I mean, they had gone to seminars. They had done various things. So whether that's Baker Eubanks, that's not clear that that was what they were referring to in that contractual provision, number one. Number two is that because it wasn't done, there was no voluntary undertaking. So if you have the knowledge, you have a contract, you have a director of security who works with the security contractor, but if he does nothing, then you didn't undertake a duty and there's no responsibility? Well, that seems pretty perverse. The law is that if you do not voluntarily undertake a duty, then you're not responsible. So that they never undertook that duty. They never did utilize those reports or give them to AB according to the record. I just don't get it because it seems to me that the people that you represent were trying to do their job as a responsible, we'll call them a landlord. I mean, they were trying to do everything that they could by getting consultants, coming up with protocols, coming up with post orders, trying to do what they could to try to protect the public. And now you're saying that they had no duty to do anything, and not only that, they didn't do anything. Well, that's not correct because, again, they took a lot of those reports and they implemented those recommendations into their infrastructure. And then at the time that they entered the contract with Ally Barton, they gave Ally Barton the responsibility of manning that infrastructure. And so that contractual provision, a lot of those recommendations had already been implemented into the infrastructure itself. So they didn't take a further step. They don't have to take a further step under the voluntary undertaking. It's like in the Bell Versace case. The parents say to their son that we're going to make sure that you don't have underage drinkers here, because there's going to be no drinking in our house, and if we see beer, we're going to confiscate it. And then that night, kids come in the house, people are drinking, parents do nothing. Kid gets drunk, he drives off and gets killed, and the mother of the boy who was killed sues and of course says, well, yeah, they had the intention of doing it, but they didn't do it. So therefore, we're not going to hold them liable under a voluntary undertaking theory because it's strictly construed to the extent of your undertaking. What about the Roe case? Are you familiar with that one? No. The Roe case was the one where they had a security company that was looking after a building and there was some guy named Fennessy who was their director, and they had a former employee who had master keys, and there were some... Oh, the Roe case. Why shouldn't we follow Roe? In that case, yes, the landlord had a master set of keys. There was... and then they went missing. Some of the keys went missing, and then later... And they decided, you know, they were told, you better change all the locks, and then they said, well, yeah, but that'll cost a couple grand, so we're not going to do it, right? Even though they knew that those master keys were out there. That's what was in the record in the Roe case. I guess I'd have to study that further, Your Honor. I'm sorry. But I believe in that case that the owner understood that those keys were out there and didn't take steps to prevent that. Okay. Why do you think, or do you think, that the Adrieus case is something that we should rely upon? Well, I just believe the Adrieus case is whether your duty is to protect the property or protect the life. First of all, we don't have that duty. We had delegated... we had, under the contract, that was the duty of Allie Barton. Only Allie Barton? You had no duty at all to your tenants? We... our duty was... our duty dealt with... Didn't you have an obligation under your lease? I don't believe so. I believe... There's nothing in the lease about security? I do not believe that... No protection of any sort? I believe that the lease provided, and I can't be positive, but I believe it provided that the tenants had their... they had locks on their doors and they were supposed to keep their own space secure. So you didn't have to provide security under the lease? Under the lease, I don't believe we had to provide security. It might be hard to get tenants if you don't have any security, though. I mean, part of being a responsible building owner in downtown Chicago or any other city is to let the tenants know that we will have systems in place where you can get in and out and that people who don't belong there won't get in and out. And that's what you're... And that's why we retained Allie Barton. That's why we... Go ahead. That's why we have this infrastructure in place. Right. Put in the turnstile system, had the keycard system, had the monitoring cameras. There's no failure here on this day of that security infrastructure or of Allie Barton itself, except according to how you were arguing it there, how she... Ms. Fowler was arguing between... that the structure was in place. Knock-in defendants had fulfilled their limited undertaking by having the infrastructure and having Allie security there. And that's where we have a disconnect, is that we had done what we could to protect this property. We're... Okay, we've got all three of you going at it. We all want a piece of you. I know. No, but if the contract here had said, we're hiring you security consultant as an independent contractor, you're the experts, you take care of it, we're out of it, then I think you'd have a good argument. I think we did that. I don't know how you can say that when you've got Jenkins retaining control, still being involved, and more specifically, he was involved in working with them in formulating, by the contract, formulating these post-orders and protocols. But he didn't do it. Maybe he should have. He was obligated to under the contract. He obligated himself. The contract at page 14, subsection K, says, AB is going to assist the director of security in doing all of these things. And so the owner obligated its director of security to work with AB in developing security manual, post-orders, and if there were no duress codes in place, it seems to me it falls in the lap of both parties. And this is where, first of all, it says that Allied Barton shall assist the director of security in developing, number one. Number two, it wasn't done. There was no voluntary undertaking here. So they didn't follow their duty. They didn't do what they were supposed to do and obligated to do under the contract that they entered into with their security contractor. No, because Allied Barton, it's Allied Barton's duty to assist the director of security in developing, implementing, updating security manual and post-orders and utilizing the recommendations by the property's security consultant. So if they had no post-orders, no security manual, no problem. Well, no, because Allied Barton did the post-orders and did the security manuals. Allied Barton had its own security manual. They had their own post-orders in place. Our director of security was there for the life system of the place, the life services. You said at one point that 90% of his duty was to deal with these other entities and agencies. What about the other 10%? Well, the 10% was to manage the relationship with Allied Barton on the accounts, whether they were being paid, things like that, between the upper echelons of the company. So it wasn't as if he was working with the security guards. Where was Jenkins during the day? Jenkins was in the building doing the 90% of the other jobs that he had. Okay. But on the third floor, where was his office? I can't recall that. Fourth floor? Yeah. So he was up in the tennis court. Oh, he wasn't there. The penthouse. Okay. Okay. So that's where he was during the day. So he did have duties in the building, but they were not doing the manned security, which they had contracted with Allied Barton to conduct. I just think the problem that you have is that specifically in the contract, you're saying we're still involved. You have to report to us. You're the experts we're hiring, but you have to report to us. We have to work on getting these posts and protocol orders together, and we're still in the, quote, game. And that may be an unfortunate word, but that you're still going to be involved. That's the way the contract reads, and since it does, it's hard for me, at least, to understand how that does not equate to a voluntary undertaking of a duty to protect, even though you did bring in a contractor. Right, because it wasn't done, because we never voluntarily undertook the duty. You were supposed to, but you didn't, so since you didn't, you're not liable. Just as the parents in the Bell case, they had said they were going to take away the alcohol. They never did it, and therefore they were not held liable. So if, I mean, to extend your reasoning to AB, AB has a voluntary undertaking in this contract for the protection of life, among other things. If they just didn't do it, they wouldn't be liable. Well, they have specific duties to undergo, and here, this isn't a specific duty directed to us. This was directed to Ally Barton. It says to assist the director. Well, if the director didn't do it, well, we weren't obligated to do it under the contract, and therefore it's not something that we voluntarily undertook. Would you agree that your client controlled the security program at the building? No, we did not control the security program at the building. Would you agree that you were involved in training? No, they were not involved in training. How about development of the post orders and policies? No, they were not. You deny doing any of those things? Yes. And I'm just reading from a brief from the co-defendants. I don't know where they're getting that from. Jenkins testified that he did not have any role in that. He may have had a responsibility, but he may have agreed to do something. Whether he did it or not is a different issue. The question is, the whole case is, well, you didn't do what you're supposed to. I mean, they were negligent. That's the case. But there was no duty for us to do that. That's what they're saying, that under the agreement with AV, there was a duty. That's what I was just reading, that you had a duty, and you just didn't perform. It was a concurrent security. Is your argument that once you contract with AV, you're done? I'm done. I don't have to do anything more. That's your argument. Our argument is that, yes, we were done with as far as the security aspect of it. We still, you know, we had to maintain the infrastructure that we had, the infrastructure in the building. With regard to security, hands off. We're done. Close our eyes for a little bit. With regard to security, we had no duty to prevent the criminal conduct of a third party. That's different. I understand. Did you have any duty? No, we had no further duty other than that. Okay. Do you want to address causation, intervening cause, anything like that, or do you want to rely on what your colleague has already done? Yeah, I mean, I don't think I can add to that analysis. I do agree that I do believe my co-counsel that this was an intervening act. It was totally unforeseeable. I believe the duty here was to use reasonable efforts, and everything that the plaintiff's case boils down to is speculation. I mean, yes, you could say that we don't know whether he had a gun when he was standing there and he threatened Mr. Brown with a gun because nobody saw the gun, but we know he did have a gun, and he ended up using that gun and killed several people, so that if they would have tried to take him out at that particular point, he could have just as easily started shooting people. He had a gun in his coat pocket. He had a gun in that envelope. He could have just killed his way all the way up to where he needed to be. Thank you. Thank you. First of all, I'd like to address the Blankenship case because unless there's a different Blankenship case, the Blankenship case, there was no contract, as counsel suggested, to protect employees or people. It was the opposite. It was more like the Adros case, my reading of that. Secondly, the lease between the Woods firm and the owner of the building on C-18088, contrary to what counsel said, it does provide access control and building security consistent with that provided in comparable buildings. So it is in the Woods lease, and Ruth Lee testified that she relied upon that. Mr. Mortimer relied upon that. So I think clearly counsel is wrong. In the Rowe case, there was no contract, unlike our case, to provide protection to people, but they said they assumed a duty once they looked into the fact that master keys were out. They were aware of that. They looked into the cost of replacing the locks, and they said, well, $2,500, I'd rather put people at risk. So despite the fact, unlike our case, there was no contract. In fact, it was the opposite, the same as the Blankenship case, that they had no obligation that they said despite that contract, they assumed a duty, and then they had to provide reasonable care. And as a result, the Supreme Court in Rowe said that's a question for the jury, not for us. In respect to the agency issue, Mr. Brown said on C-15521 that Jenkins was his boss, and he would follow whatever he would tell him to do as director of security. So that's clear. Mr. Maxey's point that despite the fact that the owners commissioned these consultants' reports, there wasn't any obligation to implement each and every recommendation, and so if they implemented some but not all, you can't predicate liability on that. That's a jury question. As Justice Levin pointed out in the Rowe case, even in Rowe where they had by contract no duty, once they assumed a duty, they're aware of an issue, then they had to exercise reasonable care. That's a jury question, not a question of awe. And clearly in this case, it was a little over $4,500 to get that distress signal on the radio that was recommended by their security consultants. When counsel suggests there are other consultants, in the contract it said owner's security consultants. There were only two, and that was produced in discovery in this case. So for them to suggest there are others, that's not a record. They didn't produce any other consultants, in particular any other security consultants. There were not. It's on record it was Baker, Eubanks, and Crowell. So for counsel to say that, it's not in the record and clearly should be disregarded. And in the Baker-Eubanks report on C14528, they talk about this first district being the second highest rated for crime, and on C14529, the summary of threat assessment, they talk about number one is workplace violence, including potential injuries to personnel as a result of assault by an interloper, especially in retail shop areas, on the upper tenant floors, in the stairwell, and in the parking garage. And then for number five is workplace domestic violence, and they also warned the owner on 14530 about premises liability, that they should make sure they file their recommendations, and that's a jury question whether or not they did. But all the crime records are in the Baker-Eubanks reports, and it's in the Crowell reports regarding the distress signal, and that's in particular. It said on the briefs that it wasn't sure what the date was for the Eubanks report. It was between September 4, 2003, and 9-11, because they did this as a result of 9-11. So it's somewhere before the other report. That's before Crowell, because Crowell referred to Baker-Eubanks. So somewhere between 9-11, 2001, and the September 4, 2003. So they made recommendations for the distress signal, which Mr. Chambers said he also recommended, was disregarded until after the occurrence. Do you agree that the distress signal is not mentioned anywhere other than in those consultant reports? Which one, Leonard? The distress signal. Yeah, but the emergency code is different. The distress signal first comes into the reports. That's correct. In the reports recommending that they do it. Secondly, then Chambers says he recommends it to Jennings. Like many of his recommendations, it was disregarded. They didn't do anything until three weeks after the occurrence. Not unlike the case Justice Lavin was talking about in respect to the Master Keys, the Roe case, where they decided $2,500 was too much. Well, the court said that would be for a jury to determine. If you look at the defendant's owner procedure manual, when I talked about it, they could have shut down the elevators as per their post orders. They also could have, and this is the MD real estate post orders and C-16191, all they had to do was announce something over the public address. They had a public address system in this building where you address it. Emergency, emergency. There's an interloper on the property. He got by security. We're concerned that he could be violent. Keep your door shut. That's all that has to be done. If you want to say, well, there's a problem, he couldn't get to the elevator or whatever, well, just announce it over the public address. That's all Chambers had to do. We got to announce it. If there's a fire, you do the same thing. And that's at C-16191. Call out to these people. Tell them, keep your doors locked. And none of that was done. I can't explain it. Clearly, it's a jury question why Chambers, all that he had seen from 1130 on, that he did nothing but walk away. I can't imagine. It's inexplicable, but it's clearly for a jury to determine what was on his mind. Why did he do what he did? I don't understand it. Call over the address system. Shut the elevator. It's all in their post orders. I don't know what was on his mind, but when we talk about the L.I. Barton post order at C-1757, and when you talk about causation and you talk about foreseeability, they talk about the purpose of the plan, of the post orders, of the manuals. The key to managing a crisis is preparation. Difficult situations requiring a quick, confident response are a normal occurrence in asset management, period. Proper handling can avert or minimize a situation and prevent it from escalating into a crisis. It says the situation has a potential of becoming a crisis when one or more of the following occur. It says the situation may escalate in intensity to a more serious problem. In nearly every crisis situation, a frontline member of the staff, security guard, receptionist, tenant service coordinator, engineer will be the first to come in contact with the crisis. In nine out of ten cases, the person's initial response will determine the building's success or failure in dealing with the crisis. Thus, it is very important that each member of the team carefully understand his or her role. And we talk about the loitering being a trespasser. We talk about the fact that he's lost. He's a suspicious person. None of that dawned on Chambers from 1130 on. But if you get to the point when we talk about the codes and the lack of understanding, I know there's been some confusion regarding the distress signal codes. Counsel said if he had gotten the code 10, it wouldn't have meant anything to him. To Chambers, he would have just walked away. I think that's incorrect. If you look at 14595, he talks about the code is Chambers. It's 15728 where he talks about code 10. And he knew what code 10 is. And unfortunately, Brown did not. But he said if Brown had said code 10, he would know there's a security problem. And this is Chambers. And unfortunately, Brown didn't know enough to tell him code 10. Brown didn't do anything. I'm not saying anything. But if he said code 10, even if Chambers was worried because he has something in an envelope, all he had to do was go 100 feet away and say shut the elevators down, call over the public address system, tell everybody to keep their doors shut. That's all he had to do. In this case, you had expert witnesses who testified that there were something like 12 or 13 different areas of negligence that in the expert's opinion was a cause of what happened here, right? That's correct. I'll ask you to wrap up. At the end of the day, it's what Jennings even said. And Jennings said it was there. They could have shut the elevators down. And he admitted had they shut the elevators down, Jackson could not have gotten to the 38th floor. So you want to talk about a but-for standard? I mean, even as late as that, all he had to do, 100 feet away, recall the elevators, shut them down, call the police. If you want to get arrested, give them that. You didn't have to, we're not going to say you had to wrestle with that. Even though there are rules, as you know, said he should. Disregard that. All chambers had to do instead of going on escalators, walk 100 feet away and say, you know, could you tell them to recall the elevators, disable them, call the police. Call Metro on the second floor. Did absolutely nothing. And I don't know how to explain what he did, but he did what he did. And respectfully, this clearly is a question of fact for the jury. And Judge Flanagan was erroneous in granting this what should be a rare occasion, granting summary judgment. And respectfully, I ask that the case be reversed. Judge Lavin erred. That hasn't happened yet. Often wrong, never in doubt. It may happen. Hopefully not in this case. Judge Flanagan. Thank you very much. All right, thank you. Thanks for the briefs and the argument. We appreciate all of it. And we will take it under consideration and issue an opinion directly. We're adjourned.